Before I launch into my arguments, I thought it might be helpful on the assumption that members of the Court may not be familiar with all the different types of vaping products that are out there, just to do a quick show-and-tell exercise and illustrate, because it's particularly important when we get to the portion of the argument about FDA's overlooking relevant factors and important aspects of the problem. So I have just some illustrative products here to show. This one is, this is a type of a cartridge-based device. This is the battery portion. There's a cartridge that goes in here. This happens to be a Juul device, which members of the Court may have heard from in the news. This one I'm holding up now is a disposable vaping device, so similar, except it doesn't have any removable cartridge. It's all fully enclosed. This here, this bigger device is a tank-style device. This is the type of device with which petitioners' bottled e-liquids are used, substantially larger than the other ones. And here, finally, I have a sample bottle of the nicotine-containing e-liquid that is manufactured by Triton, one of the petitioners. So hopefully that's helpful. We'll hear about a type of product that, while in the eyes of the law are considered a tobacco product, in fact contain no tobacco at all, but rather only nicotine that's derived from tobacco. Without notice or consideration of petitioners' reliance interests, FDA pulled the rug out from under them in many, many respects when it came to their pre-market applications. FDA imposed 10 months after the deadline for their submissions a new longitudinal comparative efficacy standard for evidence, in the words of FDA's July 9th, 2021 Fatal Flaw Memorandum, that required a randomized controlled trial, a longitudinal cohort study, or, in FDA's words, some, quote-unquote, other evidence, comparing petitioners' flavored ends products against tobacco-flavored ends products with respect to the rates of switching or cessation for adults that use combustible cigarettes. Now, this was after, for several years, FDA making not a single distinction and not suggesting a single different study for flavored ends products versus tobacco-flavored ends products. FDA also changed its requirements for the acceptable studies that it would review and the types of evidence it would review, and those, if I can put a pin in that for a second, I'll come back to that in a minute, there are at least six different changes that FDA made to the types of studies that it was willing to consider when it reviewed these applications. So I'll put a pin in that and come back to that. Second, when we get to the issue of the relevant factors and aspects of the problem that FDA overlooked and failed to consider with petitioners' applications, FDA previously, even though the 2020 enforcement guidance was not a guidance document on PMTAs, to the extent that FDA now tries to use that in impermissible post hoc rationalization to justify what it's done after the fact, FDA, in that guidance, suggested that it was certain characteristics of the devices, of the cartridge-based flavored products, the devices themselves, that uniquely attracted youth to them. But now, after the fact, in its August 17th, 2021 memorandum and its technical project lead memorandum on petitioner's applications, FDA says, across the different device types, the role of flavor is consistent. Yet again, another, in Judge Oldham's words, switcheroo by the agency, again, without notice to applicants and without any consideration of their reliance interests. And based on that, FDA now argues, well, the sales access restrictions, like the ones that petitioners put forth in their marketing plans, won't move the needle when it comes to youth access. But again, petitioners weren't told of that shift in FDA's interpretation of the available science beforehand. Instead, it was foisted upon them well after the fact, after, in fact, they received their marketing denial orders when they had to request and receive their technical project lead memorandum. And sticking on for one second, the 2020 enforcement guidance, FDA specifically listed in that guidance, as the BIDI court, the 11th circuit, underscored certain, quote-unquote, adequate measures that manufacturers of products, open system products, e-liquids like petitioners here, could take to prevent youth initiation. FDA's own words were those were adequate measures. Yet, when petitioners put those in after the fact, FDA now says, those won't move the needle, those aren't adequately sufficient to prevent youth initiation and use. And now we've seen, not even in the technical project lead memorandum, or the MDOs, or the fatal flaw memo, but for the first time in litigation, FDA now suggesting that biometric controls on a device itself are required to sufficiently offset, potentially sufficiently offset, youth, the attractiveness of these products to youth. Again, we're talking about a bodily liquid here, not the device itself. Neither of petitioners manufactures any of the devices in which their bodily liquids are used. On top of that, while this case has been pending, due to new facts that have come out from other concurrent appeals and other circuits, we found that FDA has egregiously failed to treat like cases alike. Both before the September 9th, 2020 application deadline, and then afterwards, FDA told, told applicants that were affiliates of large tobacco companies in deficiency letters, it would be helpful if you would provide some evidence, some sort of a switching study evidence. But petitioners here, like the hundreds of other applicants that were denied in the August and September and October 2021 timeframe, received no such deficiency letter and no notice whatsoever ahead of time, other than on August 26th, 2021 in a press release, only two weeks before the first of these MDOs came down, that, that FDA was looking for that longitudinal comparative efficacy evidence. So here, straightforward application of the black letter rule that like cases need to be treated alike. Again, another way that FDA acted arbitrarily and capriciously here. Now I want to, I said to put a pin in for a second, the ways that FDA changed the study requirements. I'd like to just run through those briefly. In the 2018 public meeting that FDA held with potential applicants, it suggested that it may be the case that no new clinical studies would be required to support a successful pre-market application. In 2021, FDA denied the application specifically because they failed to include such clinical studies in the form of a randomized control trial or a longitudinal cohort study or some other comparative efficacy study that followed the behavior of the consumers over time. So again, completely contrary position to what they suggested before the deadline. In the 2018 and 2019 public meetings, FDA suggested that the focus of the APPH analysis, the appropriate for the protection of public health analysis that's a statutory standard, was really three things. It was the constituents of toxic concern, the risk of disease, morbidity and mortality in FDA's speak, and then the decreases in morbidity and mortality from tobacco product use overall. On all three of these factors, these products and products across the board compare favorably to combustible cigarettes. And on all three of these factors, if it's a tobacco flavored bottled e-liquid or e-cigarette or if it's a strawberry flavored or watermelon flavored, what have you, menthol flavored, they have essentially identical profiles when it comes to those characteristics. But then after the fact, we have marketing denial orders, not based on those considerations, but a lack of evidence from longitudinal comparative efficacy study comparing the flavored ends product, the flavored e-liquid to a tobacco flavored product when it comes to cigarette switching. The third point, in the 2018 public meeting and its PMTA guidance finalized in 2019 and in both its proposed and then its final PMTA rule, FDA suggested that long-term clinical studies would not be needed. But in the words of the motions panel here, FDA created at the very least a strong presumption that such evidence is required again after the fact. In the 2018 public meeting and the PMTA guidance, FDA explicitly encouraged applicants to conduct single point in time consumer survey studies on issues like perception and intent, intent to use, showing consumers a product and asking how they perceive the product and would they intend to use the product. In fact, in the 2018 public meeting, if the court looks at the FDA's own slides for that meeting, it says that these sorts of studies are widely accepted as a predictor for initiation and cessation. And FDA's, and I'll point to appendix 324, A324, FDA specifically suggested that longitudinal studies like randomized control trials were not required. After the deadline, in its August 17th, 2021 memo and in the TPL reports, FDA found based on, explicitly based on its own experience over the previous 10 months of reviewing these applications, that single point in time studies were not reliable measures of behavior change over time and instead that it needed longitudinal studies to track participants' behavior over time. The fifth point, in the 2018 and 2019 public meetings and the guidance, FDA suggested that literature reviews and consumer surveys with bridging rationales would be permissible evidence to support marketing authorization. After the fact, if we look at the check the box scientific review forms, the TPL reports, and the marketing denial orders, FDA was really only looking for longitudinal comparative efficacy studies based on Petitioner's specific flavored products. So FDA threw out the window analogies to other similar products and required that it be, those be longitudinal studies on these specific e-liquids. Final point, both the proposed and final rule promised an APPH determination based on quote all of the contents of the application, including the marketing and sales access restrictions, and FDA itself described those as quote unquote critical. After the fact, the only thing FDA looked for was whether there were randomized control trials, longitudinal cohort studies, or this quote unquote other evidence of comparative efficacy switching studies over time. What's really the- Okay, your uninterrupted time is done, so I want to ask you a question. In your original brief dated November 10, 2021, you made an argument about lax statutory authority, but then you said alternatively the court should vacate the MDOs and enjoin FDA to withhold further adverse action on Petitioner's PMTAs for 18 months to allow time for further studies and supplementation. That 18 months is last Wednesday, so if we were to affirm, wouldn't you be able to go and have an opportunity to satisfy what you call the new requirements? I'm not agreeing with that, but just saying to you, you've had your 18 months. Your Honor, the, the, the, so Petitioner's here have, have, it's been a bit of a start stop process. They have started down that path, and then we've seen in the Reynolds decision, the conclusion from this, a panel of this court that, in fact, this was a, this was a substantive rule that wasn't required, but yes, what we're looking for here is to vacate the MDO, to remand back to FDA as a final decision to allow us to go do that. We're not asking for an order directing FDA to grant marketing authorization. We're simply asking for the opportunity. But what I'm saying is if we affirmed what they did already, that you didn't satisfy them before, you now should have had the time to do what you said you needed to satisfy them. Well, the, the problem is, Your Honor, if, if you affirm what's happened, products cannot stay on the market, and my client's out of business. That's the long and the short of it, because the only reason my client's still in business is because of the stay order that remains in effect. So even if, if this court affirms, even if we went back in and asked for those 18 months for a chance to satisfy, and so that's, you've had that time, whether you should have or not. Under our majority opinion, you shouldn't have, but here you are. I understand, Your Honor. Yeah, yeah. The reality is FDA doesn't make these decisions quickly, and if this is affirmed, my client's are out of business. Counsel, can you, I'm over here. Oh, okay. Can you address harmless error? The, I think the Third and the Fourth and the D.C. circuits all found harmless error. The Seventh Circuit found the process was satisfactory, I think, but the Third, Fourth, and D.C. said harmless. Can you help us? I mean, it said it was, why would this not be harmless, like our sister circuits found? I, I'd be happy to, Your Honor. The, the, um, as the Biddy Court found, the Eleventh Circuit found, clearly FDA's changes affected the procedure that was used, and because this is a weighing of risks and benefits, of, of the, the risks and the benefits of putting, of allowing these products on the market, it was necessarily prejudicial, and, um, I, I think, unfortunately, the other circuits attempted to foist a, a burden-shifting exercise, which the Supreme Court has said is not what, what this is, uh, on the petitioners here to prove absolutely that FDA would have approved their applications, and that's not appropriate here. Um, the reality is that there were, there were many facets of this, and, and they're kind of laid out in our briefing, of things that FDA ignored. Wouldn't the burden be on FDA to show that it would have taken the standard? That's a, that's somewhat a friendly question, I would think, uh, that if you're showing harmless error in any normal context, like if the government's showing harmless error in a sentencing case, they have to show that that would have been, they bear the burden to show it would have happened anyway. Right, Your Honor. Here, the, there's certainly case law that says it's our, it's our burden, but it's not our burden to prove that they would have had to approve the application had they not done these things. The reality is, because the procedure changed, there are, there are many facets to these applications that FDA didn't consider, and so necessarily, ipso facto, petitioners were prejudiced, and so it needs to be remanded back to the agency. This is, like, the, the Chenery line of cases, and that wouldn't, it's not the place of the court, as the, as the Eleventh Circuit, I think, properly found, to itself attempt to weigh the evidence after the fact. It's proper, it's proper to, to vacate and remand back to the agency for the evidence to be weighed under the proper, with the guidance of the court. So, so is every error that impacts the process then subject to remand? I mean, is there harmless error? There, there, there could still be harmless error, Your Honor, but here, if we look at the totality of the circumstances, this clearly comes well over the threshold, because there are very, there are specific things that FDA instructed applicants to put in that they then turned around and overlooked. There are, to draw an analogy to the, what the, what the Eleventh Circuit did in Biddy, there are certain elements of the marketing plan here, just to focus on, on, on that discrete part of the application, that FDA didn't, didn't consider, that were not any, anything that FDA previously had said, well, that doesn't move the needle in their 2020 enforcement guidance. Things like a focus on point-of-sale marketing in age-gated vape shops, where one must be at least 21 years old just to get through the door. That's not something that FDA previously had sort of poo-pooed. Limiting, limiting sales only to those outlets, not in a general access convenience store or other sort of retail outlet. Limiting social media posts only to imagery of the product, not using social media influencers or human models. And FDA itself specifically said in the 2020 enforcement guidance, we think quantity limits can be an appropriate method, restricting how many products someone can, can buy, so they're not a straw man purchaser to turn around and sell, sell to youth, that that can be an appropriate way of dealing with this issue of social sourcing. Is your marketing plan unique? No other vaping seller does what you do? Others do, Your Honor, including those things I just listed. Okay, so then what was the harm done by what you claim was the error of the FDA? Because they've looked at this and it hasn't worked. Well, first of all, they're, they claim, they claim it hasn't worked. I don't know what they've looked at or haven't looked at, because they've said this for every single flavored application, and they ruled on 99% of the applications that went in. But, but petitioners did themselves something that FDA specifically recommended, and again, the switcheroo is saying, apparently rejecting, although they didn't even look at it, so we, we can't even know really what they think. That's the problem. When they haven't looked at the evidence, it's a rationalization for them to now come in and say it doesn't work. But what is unique about it? I mean, the problem is that you have to be 21 to walk in a bar, but that certainly doesn't mean that not, that not some young people end up in a bar, etc., etc. So the reality is this notion of keeping kids away. I wish it was working, but it isn't. And so what is unique about your approach that they should have looked at? Well, there are indications it is working, because when Congress increased the minimum age from 18 to 21, in fact, the youth usage rates have steadily declined, have steadily declined since then. The reality is there's no evidence that any youth used this product at all. This product is not these two other disposable or cartridge-based products. There's no evidence at all that youth use this product. The, the, the bottled e-liquid and the open system devices that they use in, in FDA's own survey, the National Youth Tobacco Survey, say that that's the smallest percentage or smallest segment of youth usage is within. But after they take one out, then the other shows up. I mean, in other words, the youth will go and get what they can get. So that's the problem. I respectfully, Your Honor, in fact, if you look at the 2020 NYTS data and the 2021 NYTS data, for there to be a rational connection underlying FDA's argument that it's flavors that are driving, when the, when these flavored cartridge or flavored cartridge-based products were taken off the market, what we would expect is we would expect some proportion of those youth to shift into these types of products to being used with e-liquid. In fact, we saw the relative proportion of youth using the open tank systems going down and actually shifting more into the disposable, which actually suggests that it's the characteristics of the disposable device that drive youth initiation. It's not flavors. If FDA had come out in 2020 or 21, excuse me, and said, there's been a change of administrations. We're, we're throwing out these marketing or these guidances that we did before. We're going to ban these products. Could they have done that? They would have, Your Honor, have, have, meaning these products, meaning flavor products, they would have had to go through a notice and comment rulemaking process to make a product standard. And in fact, they have denied the marketing applications of hundreds of thousands. Have they, have they approved any of them? Not a single flavored product, including not even menthol products. So isn't this a de facto rule? Absolutely it is, Your Honor. So if we were to remand, FDA would have to be put to the test of either changing the standards, which is requiring the longitudinal studies that I gather practically none of these small businesses can afford to undertake because they cost hundreds of thousands of dollars, or just simply saying we're done with it. Kids can no longer vape. Flavors are no longer allowed. Well, there are, there are businesses that could undertake this potentially, Your Honor. But I think the, the, the important point about notice and comment rulemaking is the agency must consider input from the affected industry. And that's exactly what didn't happen here. We have the agency jumping to conclusions about, well, it's flavors that drive, when in fact the data suggests otherwise. Because it didn't go through this proper procedure of notice and comment rulemaking, it wasn't obligated to consider and respond to meaningful comments. All of that wasn't considered, which underscores the depth here of the arbitrary and capricious agency action. On remand, if we were to vacate, then your client would produce its product until FDA promulgated with notice and comment these new requirements. Correct? Yeah. If, if the notice and comment wasn't a ban, but it wasn't, it wasn't a product standard that was a ban, but it was, okay, we need a longitudinal cohort study or an RCT, my clients ostensibly would, would comment on that. And then when it's finalized, they were to, one would believe a reasonable period of time for applicants to conduct those studies, supplement their applications accordingly, and try and make the, the APPH case. And let me just ask one thing. What is it about vaping that's harmful to you, since there's no, no tar from the tobacco smoke? Your Honor, put your finger on it. As a class, these products are, um, Royal College of Physicians in the UK has said 95% less harmful than combustible cigarettes. I mean, they're just basically aerosol, right? That's correct, Your Honor. Are they any different from perfume? Well, except you sniff them. Nicotine is certainly an, an addictive substance, Your Honor, but, um, in terms of, it's a night and day to try and compare these to a combustible cigarette. And unfortunately, in FDA doing what they're doing, they're going to drive many, many adult consumers of these flavored products, which are what the overall majority of adult ENDS users use, back to combustible cigarettes. Well, you know what Australia has done. They have said that vaping can only be obtained by an adult who has a prescription. So that's how they've handled it. And they've created a map. So you mentioned England, but Australia has done something different. So it's obviously not thinking this is just, uh, just another, uh, glass of coke. What they've created, Your Honor, and doing that is a massive black market for these products, for unregulated and potentially unsafe products. And that's what I would hope FDA would want to avoid here. Okay. You have time for rebuttal. Thank you. Ms. Powell. May it please the Court, Lindsay Powell for FDA. Unanimous panels of the third, fourth, seventh, and D.C. circuits have rejected the arguments the petitioners advance here and concluded that FDA did not move the target or raise the bar. Instead, FDA reasonably considered the evidence before it and determined that the evidence of benefits did not outweigh the substantial risk of harm to kids. And if you look at the evidence actually presented here, it shows why. Petitioner's own literature review concluded that there is not enough evidence to determine whether e-cigarette flavors help people make the switch from cigarettes. That's the benefit they claim, that it's going to help people switch and stay away from these more dangerous products. Their own literature review says that the evidence doesn't show that. Their surveys also fall short. If you look at the main survey they offer, which begins at page, uh, 474 of the appendix, it's an online survey of a couple hundred people, and it asks what types of e-cigarette flavors they prefer. That's not reliable evidence, and it's showing that adults prefer sweet flavors is in any event not the same as a showing that the use of those flavors is going to help them switch away from cigarettes. I do briefly want to address the device type, um, issue while we have these examples here. There are a couple things on this point. For one, the smaller cartridge-based devices also come in a refillable form. So there, there's a type where you can take the cartridge and pour e-liquid into it and put it back into the device, and so those are smaller and not these bigger tank varieties, and Petitioner's products work with those, too. With respect to the, the tank devices and the open systems generally, the evidence shows that kids do use them, not in the same numbers currently that they're using disposables, but they do use them, and I want to touch on those numbers. So looking at Petitioner's own, uh, data that they from the 2020 National Youth Tobacco Survey, over 1 in 5 middle school e-cigarette users use tank products, over 1 in 5, and nearly 1 in 6 high school students, the same is true. So that's over half a million kids who are using those products. If you look at page 16 of Petitioner's supplemental reply brief on the en banc filings, they also go through some data from before the using tank-style open system devices, and Petitioner's say, but that doesn't matter, that's no big deal because fewer kids were using them. In their brief, in that data, 2.2 million kids were using e-cigarettes at that time, and 85% of them were using these products. That's what they were doing when cartridge-based devices weren't available, when disposable e-cigarettes weren't available. Kids use these products. FDA found that there's overwhelming evidence of the any benefit. Recognizing the harms, excuse me, presented by new tobacco products, FDA, Congress put the burden on applicants to show that new tobacco products will present a benefit to the public health, and made the default that they cannot be marketed until that affirmative showing is made, and Petitioner's here simply failed to make that showing. I would like to yield the rest of my uninterrupted time for questions. Suppose instead of the way the FDA did this, suppose that they had said, we're going to put out a notice of proposed rulemaking, and this is, we're not going to do the MDOs, the 55,000 in one day in a press release. We're going to put out an NPRM, and we're going to say, hey, listen, everyone who's interested in this, tell us what you think the restriction should be on marketing to youth, for flavored, for menthol, for non-flavored tobacco products, and some people came in, and they said, we're going to do pop-up gates. Some people came in, and they said, we're going to do limitations on social media. Some people came in and said, as you point out in your brief, biometric restrictions on the devices themselves, and so there's a bunch of comments filed, and then FDA, in the final rule, says, we changed our mind. We don't care about any of this. We've just determined that flavored products are banned, and we didn't read any of your comments. Is that arbitrary and capricious? Sorry, what was the last part? Is it arbitrary and capricious, that we didn't read any of your comments? The final rule needs to be a logical outgrowth, and the agency needs to consider significant comments, yeah. So you'd have to consider the comments there, but you don't have to consider the submissions that are made because it's an informal adjudication? I would love to explain how FDA's consideration of the marketing plan worked, if I may. So before we get, and I'm happy to talk about that, I just want to make the legal rule first. Does FDA have to consider the things they said they were going to consider as a matter of law? An agency does not need to consider something that it reasonably knows is not going to affect the outcome, and I would love to explain how FDA knew that here. And I definitely want to hear it, but I just have a broader concern about how this works with administrative law more generally, which is, if they had done this through notice and comment, post-rule, we would love to hear what everyone thinks about restrictions on youth marketing. Everyone files their comments, they spend millions of dollars on their lawyers, they hire a bunch of consultants, they come up with 30 different proposals, all the comments are filed, and then FDA in the final rule says, we did not read a single word. But it doesn't matter because we've made an independent policy judgment that we're banning flavored ends products. Why is that unlawful? Or is it unlawful? Maybe it's a better question. It's certainly, the way you've described that rulemaking, that is a problem. That's not what happened here. It's not analogous to the way this adjudication was conducted. So here, what FDA explained, and this is at 93 in note 19, is that FDA knew the universe of traditional marketing and access restrictions. It knows how tobacco companies have historically gone about trying to keep kids, ostensibly, from using these products, not using cartoons, not using very young-looking influencers, using age verification. And FDA is well aware of these measures. They're discussed at length in the 2020 guidance. And what FDA says is, we know what these are, and we know that they're not going to make a difference here. So it's not that it said, we don't even need to think about them. It was saying, we know what they are and that they're not going to, that they don't make enough difference with respect to the way kids access these products that is going to change the way we weigh the risks and balances, so as to affect the outcome. And that is entirely reasonable. That is FDA looking at the evidence, saying what it knows, and reaching a conclusion. So what would a flavored ends product manufacturer have to have shown in their report, I'm sorry, in their PMTA, for FDA to have approved it? So if you look at, petitioners knew the type of showing that they needed to make, and that that's evident from the surveys that they did submit. So if you look at pages 379 to 80 of the appendix, they understand that the showing that they need to make is that flavors are going to get adult smokers to make the switch and stay away from combustible cigarettes. And FDA has said, we will look at a variety of literature reviews. It could find some support in these sort of point in time surveys. It could find some support in more robust longitudinal or randomized control trials. But what it has never said, and would be absurd for it to say, is that any study you do at all, if it's your online survey of a couple hundred people asking them what they think about dessert flavored products, that that's going to be enough. It never said that. And that's what petitioners submitted here. But the idea that they didn't know what they needed to do, and that they didn't know that they needed to make this comparison, is refuted by the record here. So the surveys they do cite, try to show that adults prefer these sweet flavors to tobacco flavors. They know they need to show that there's a difference in preference, and that... Well, and haven't there been a lot of showings that the kids prefer the suicide bunny bunny season or whatever? That is appealing to kids. And kids don't particularly like the tobacco flavor. And so, does that also affect your analysis? Absolutely, Your Honor. That's on the risk side of the equation. So the statute says FDA has to consider the risk that kids will start using these products, and weigh that against the benefit that they will help people stop using more dangerous products. And that's what FDA did here. I wanted to ask you about the marketing plans. I noticed in the panel opinion, it mentions that at oral argument, the FDA clarified that it reviewed a summary of the marketing plan. So I have two questions, and I'll ask them both, and hopefully you'll have time to answer before the next question. Number one, to what extent did the FDA review the marketing plans themselves, as opposed to a summary? And more importantly, who created the summaries that were claimed to have been reviewed last time you were here? Yes, Your Honor. The summary that was referred to is actually just on the prior page of the appendix from the one I was pointing to with the studies. And so this appears in the petitioner's application. It's on the preceding page of their application, and it's a summary of the longer separate section that they have on sales and marketing restrictions. And so it's prepared and submitted by petitioners, and it outlines exactly the same things that are in the marketing plan itself, which is age verification, not using specific gimmicky things that are You're talking about a summary that was prepared by the client on this side? Yes, Your Honor. Okay. That's correct. And so that was in the same main body of the application, the same narrative that FDA read through in considering this other evidence, not in the separate marketing plan. And from that, and also, you know, the marketing plan itself is now in the record. We all know exactly what's in there. Both of these confirm, and counsel confirmed today, that there's nothing in there that's new. These are the same types of measures that FDA had previously considered and expressed in the 2020 guidance were not enough to stop kids from smoking. And I do think there's been some confusion about what the 2020 guidance said about those statements. FDA has made about these types of measures being critical. They're critical in the same sense that a minimum age of sale is critical. It's of course important that there be laws that you can't sell these products to children under 18 to children under 21. That doesn't mean that that's enough to keep kids from smoking. And the same is true with restrictions on kids accessing these products to require verification of their age before purchasing a product online is important. We want that. We don't want to make it easier for kids to get these products, but it has not stopped them from using it. And that was FDA's observation in the 2020 guidance. It had actually previously considered in the proposed guidance, focusing enforcement efforts on the way products are sold. And that's discussed in that guidance. It's at 204 of the record. But in the course of that policymaking, it found that doesn't do enough. It's not enough to focus on how they're sold. Let me just ask you, I mean, if there's no question from reading those guidances as I did a while ago, that FDA always hedged its language. But isn't it curious that the hundreds of thousands of applicants for approval, every one of them was misled about the need for longitudinal cohort studies, comparative efficacy studies, and every one of them was misled about sufficient marketing plans that leads to denial of every single. Couldn't FDA look at itself and say, well, maybe we didn't make ourselves clear if you can't find a single one? Well, the results in these adjudications is a reflection on the quality of the evidence submitted. But a couple of things directly. No, no. I'm talking about the fact of the large universe of applications and that they said 99 percent, but nobody can identify a single manufacturer whose product was approved. That may be because these products don't provide the benefit they're claiming. But maybe because they all miss. Don't you think they'd have rather stayed in business than be put out of business? And again, petitioners tried to make precisely the showing that they now claim they didn't know what was required. Isn't this the problem with regulation that's out of control? When parties cannot tell what the standards are, and then they violate the standards, and then you put them out of business. That is a very extreme measure in our society, is it not? And I know you're talking about health, but it's not like fentanyl where people die. So it's a different kind of risk. Your Honor, the four other courts of appeals have unanimously held that's not what has happened here. So FDA... But one court held the opposite, though. So do you have an answer for the question on the merits, other than the fact that the courts held up, can you not fight the FDA? FDA did not, very explicitly, did not require longitudinal or randomized controlled trials. So the fatal flaw memo of 2021, July 2021, on which petitioners rely, was superseded and was not applied here. But all the TPLs that I read said there were no such comparable studies. They looked for those studies, which are sort of the benchmark in science, generally. It is what you would expect FDA to look for, but it also looked for other types of evidence, which is not what the fatal flaw memo says to do. And so FDA looked at the studies submitted here and explained why they were insufficient. How else could you have issued 55,000 MDOs on one day, unless you were just flipping pages or scrolling on a screen, and no longitudinal here, no same market, nope, not looking at the market. Because in these TPLs, they basically said we're not looking at the marketing. You can tell from the TPL here and from the so-called check the box form, from the MDO itself, on page 151 of the record, that FDA did look at these studies. It looked at the surveys that petitioners submitted and found them lacking under the standard established by Congress. And so that's what all of these other courts have found. They found, they looked at the studies or they looked at the summaries. I'm confused now on what the facts are. Sure, Your Honor. The summary is specific to the marketing plan. Right. So did they look at everything? Or did they look at summaries? Of the studies, they looked at what petitioners submitted. There's no, I mean, it's just summaries. This is part of the problem is that petitioners did not identify the methods or the actual conclusions or anything about how these studies were done. You've got about a page and a third here where they sort of say in various forms, adults like flavors. We have these surveys that show that. They don't even uniformly show that. One says that in at least a third of cases, people first use tobacco products and trying to switch away from, tobacco flavored products, sorry, and trying to switch away. So were the surveys analyzed or not? The surveys were analyzed. Themselves? Themselves. The information that petitioners submitted, the surveys were analyzed and they are deeply wanting, again, we're talking about an online survey of a couple hundred people that just says, you know, which types of flavors do you like more? That is plainly not enough to prove that these products are going to benefit adults to a sufficient degree and in sufficient numbers to outweigh the substantial risk of harm to kids. What is the standard that the FDA would have us apply to harmless error? The 11th Circuit said an agency decision is harmless only when a mistake of the administrative body is one that clearly has no bearing on the procedure used or the substance of the decision reached. That's from the Bitty Vapor citing United States versus Schwartzbaum. That's the 11th Circuit standard for harmless error in this context. What is, what is the FDA maintain as the correct standard? Do you concur that that's the correct standard? Yes, Your Honor. There's no dispute about the standard. I think our disagreement is how it's applied. The 3rd, 4th, and D.C. circuits did apply it correctly and as petitioner acknowledges, the burden is on them to show that the error here, if there was one, was prejudicial. To show that it made a difference to the results and they try to make this into a procedural error, but it's not one. The question is did they weigh the evidence before it? That's a substantive question. And what these other courts have said correctly is that FDA was well aware, as we know from the record, of the universe of available marketing and sales access restrictions. Suppose the, I forget whether it's the CPSC or which, maybe it's the EPA that regulates dishwashers. And suppose the, and of course they're turning the screws on dishwashers right now. So suppose they said you have to, we're reducing the amount of water that you can put through a dishwasher from 3 gallons per cycle to 2 gallons per cycle. And then a year from now they're saying, you know, and you, industry, you have a short period of time to comply with these new regulations and make a workable dishwasher. And then they come back and they say a year from now, no, we've decided it really has to be only a half gallon of water, not a gallon, because otherwise the environment will be harmed. Would you agree that manufacturers of dishwashers would have reason to feel that there had been a, quote, surprise switcheroo? Yes, Your Honor. What I reject is the idea that that's analogous to what happened here. So if you look in the 2019 guidance, which I think is the main source that panels of this court and the petitioners look to to suggesting that the target moved, it didn't move. What this says, first it repeats the statutory standard that these applications need to be supported by well-controlled investigations or, as appropriate, other valid scientific evidence. This is a real robust showing that Congress has required. And FDA says that non-clinical studies alone are generally not sufficient to support a determination that products will promote the public health. They discuss, you know, what it means for something to be well-controlled. It has to control for bias, confounding variables, other factors. Petitioner surveys do none of this. They're also not specific to these products. They don't tell us what these products are going to do in terms of helping. Let me ask you the 18-month question. It's been 18 months, whether it should have been or not. And so if we were to affirm, and they had done what they said they would do, can't they reapply to you with all of this information they gathered over the 18 months? Absolutely, they could have applied, reapplied at any time. There is no limit on the number or denial order issue that they wanted a period of time to perform these studies. But we've seen and heard nothing about these studies. You denied it. They said give us more time, and you denied that request a week later. Nothing prevents them from resubmitting in the meantime. I know, well, except for the fact that they're out of business and they don't have the money to pay for it. Well, no, the redoing the studies is what keeps them from going out of business. Their claim is No, you've denied them, right? If we affirm they're out of business, he just said that. Is that wrong? My point is they could have reapplied sooner. They don't need to wait. Yeah, they've had the 18 months that they asked for. It happened. We've been sitting here. How long is a randomized control study? 12, at least, right? No, and this is in the record, Your Honor. This is at 85, I believe, footnote 23, where FDA explains the difference. I think this confusion sort of permeates the decisions that have issued here that long-term just means a study of greater than six months duration, and FDA has been clear about that throughout its guidance. This doesn't mean years and years and following them through time. It could be two months, three months, four months. The point is there needs to be some sort of showing from which FDA can conclude. Well, they've had three sets of six months to get to 18 months. Can you go back to, I'm sorry, go ahead. I'm sorry. So they've had that opportunity, right? If they were actually trying to get you all to affirm them, wouldn't they have been doing something and submitting it back to you instead of just hoping that we'll rule for them? Yes, Your Honor. I have two questions, one related to this prejudice showing. What authority gives that standard, and what is the burden on the prejudice showing? I don't have a case site for you, but I think the statute here incorporates the APA standard, which requires that a harm be prejudicial in order for it to be actionable. By what standard? Materiality. I mean, likely to have affected the outcome. And so again, where you have- Does it have to have affected the outcome in every case? Yes. And there's a distinction that petitioners tried to make much of between a procedural error. So if you take, we don't argue that this rule is limited to the rulemaking context, but if you take the rulemaking context and there's just a failure to allow for comment, that that, at least in some circumstances, has been found to be prejudicial in the sense that you really infected the whole process and you don't know what people would have said and how the agency would have considered that. This isn't that type of procedural error, even acknowledging you can have procedural error in the context of adjudication. This is, the alleged error is that FDA needed to weigh evidence that was in the record and that it didn't weigh it. That's substantive. And so you just look to, if it had looked at the evidence and weighed it, would the outcome have been different? And this is a unique case because we have the 2020 guidance where FDA did weigh that evidence. It said specifically what limited effect these types of procedures, these marketing and access restrictions, age verification, have on kids accessing these products. They don't keep kids from using these products. And so we know if it's remanded to FDA to consider the marketing plan, petitioners concede that's all they proposed. It's age verification, it's quantity limits, it's not using cartoons and kids to sell products. Could you address something that was raised by one of the amici? One of the amici says that the FDA has a conflict of interest vis-a-vis e-cigarette products, given the way that the FDA collects $700 million from combustible tobacco user fees and that it can't collect from these INS devices. Does that have any force? And if not, why not? Yes, Your Honor. So it misunderstands the statute and the fee collection, the amount of fees that FDA collects, the way the statute is written, is not affected by that. And actually that issue was raised for the first time. It hasn't been raised here or in any of these until the Grippen petition, in which they just sought cert in the Supreme Court, and the Supreme Court denied cert on that case yesterday. So that included for the first time. Right, but is that so you're saying that they don't collect fees, or there's such a small amount of fees that it's immaterial and it doesn't affect their judgment? So with the caveat that I haven't briefed this here, I believe that the statute does not, the fees don't include e-cigarette products. That's not the way Congress wrote the statute based on the market at that time. And it also specified a fixed amount of fees for every year. So that amount is fixed by statute. It has nothing to do with e-cigarettes. And so regulation, not regulating them, doesn't affect that amount. That's just set by Congress, but also not raised here. What do you do with the fact that the FDA gave deficiency letters to some applicants, but not to others? Right here. Thank you. Sorry. So with the deficiency letters, FDA decides whether they're warranted on a case by case basis. It's reviewing these applications case by case, looking at the evidence. And in some instances, the total amount and type of evidence put forth warrants a greater back and forth with the applicant. And so FDA, in those instances, has issued deficiency letters. I think the main claim here is that it's unfair because those folks then knew they needed this comparative evidence and that petitioners didn't know. But we know from the record here, 379 to 80, that they did know because precisely the thing they tried to show is that adults like their flavors more than tobacco flavor, with the implication being that adults are therefore more likely to use these flavored products to switch. That's the comparison. But a deficiency letter gives an applicant an opportunity for a second chance, and that was not granted to this petition. As is often the case. But again, two main things. They knew that they needed to make the comparison because they tried to do it. And as the earlier questioning reflected, they have had time since to do exactly these studies if they were actually sincere in wanting to do them. They've had 20 months since the date of the denial order, 18 since they first made this representation about wanting to do it to this court, and nothing has stopped them from actually undertaking studies if they can make the showing they claim. Counsel, on the point that they have had time, they could have done the studies, suppose by hypothesis we find that it was arbitrary and capricious simply to ignore the and we remanded it. Now, that doesn't mean they win. The FDA would consider, again, the applications, and then the FDA would be free to say you don't have the studies, right? Right. Okay. Right. Yes. And on a remand? I just don't understand why we're taking that into account right now, that you could take that into account on remand if we remanded it. But for us to say right now, well, they could have done it, so we're going to ignore your arbitrary and capricious refusal to consider the marketing orders. I don't understand that principle. There are two discrete points, if I'm understanding the question. So the sales and marketing restrictions are, as alleged by Petitioner, a separate basis for reversing FDA's decision. Yes, just as the 11th Circuit did. Yes. So that limited remand there had nothing to do with all of the switcheroo, moving target, moving the goalposts. Well, it said the 11th Circuit held that you failed to consider a relevant factor, the marketing and sales access restrictions, which the multiple guidances have said were critical to their application. So I'm saying suppose we remanded on that basis, you would be able to consider the absence of studies, so that it would be relevant at that point. I don't understand how it's relevant now. So a remand limited to the marketing issue, my understanding is that FDA would only re-examine the marketing issue and look at the marketing plans, which Petitioners will say they didn't look at adequately in the first place. So it wouldn't have to do with all this other evidence, with whether the surveys are enough, with whether there was comparative evidence. It would just be whether age verification, quantity limits, whether those are going to be enough to keep kids from using these products. That's the extent of the remand in BIDI. It doesn't have to do with all this other evidence. And if the Court were to remand on that basis, FDA wouldn't need to revisit the other questions. Those are discrete issues as presented by Petitioners. And I take it from your answers to some of my colleagues that you disagree with the panel opinion, the merits panel opinion, that we could just look at the marketing plans ourselves and just say, oh, this is harmless. I agree with that, Your Honor. Oh, you think that we could. So why is it that we could look at the marketing plans and say, oh, gosh, this isn't going to do anything to change the outcome here. But in the notice and comment hypothetical, we couldn't just look at the comments and say, oh, gosh, this wouldn't have done anything to change the outcome. I think what makes this case unique from a harmless area perspective is not only do we have the marketing plans and know exactly what it is Petitioners want FDA to look at. We know that FDA has looked at precisely those things before. And so it's entirely appropriate for the Court to look at the marketing plan, look at the 2020 guidance. And we have Petitioners' concession that the marketing plan is the same as the guidance, that it's the same measures, and to know what FDA is going to do with that. Because it has previously said, these are important. You need to do this to try to help kids not smoke, but it's not enough. Let me ask you, if they came up with a study that said that their marketing plan has prevented 99 percent of youth from being able to access this product, you're saying that's irrelevant? No, Your Honor. I'm saying that's counterfactual. I'm saying if there were— Counterfactual to what? Because you didn't read the marketing plan. We know that the marketing plan proposes exactly what's in the 2020 guidance, and that FDA has previously said that's not— And you did look at the summary. Yes, Your Honor. And it doesn't show this 99 percent. It would have been in all caps. Yes, but that would have been key in the summary. They would have put that in all caps, wouldn't they? I was asking hypothetically. If, again— Would that have substituted for a longitudinal comparative study? Not substituted, Your Honor, but certainly if there are measures, and this is where the device access restrictions become relevant as an example, to be clear, not something that FDA— We're not talking about biometrics. That is totally post hoc. It is an example of a thing that FDA could consider as a means of reducing, in a real way, the risk to kids. If there were— Well, not if the FDA hasn't told the regulated parties that that's a component. Well, I don't mean to be argumentative, but if you want to have a concluding remark or so, you may. Thank you, Your Honor. The bottom line point is that applicants clearly knew from the statute that FDA would be looking at harm to kids and benefits to adults. The statute provides a great deal of information about what they needed to show, and as court after court has held, FDA did not change the standard on applicants. They simply looked at what the evidence was that was submitted and found it wanting, as is the evidence in this case. Thank you. Commissioner Hyer, rebuttal. Thank you, Your Honor. FDA relies on the statute to claim that it was supposedly clear that petitioners tried to meet the standard. I point the court to the circuit's decision, the ExxonMobil pipeline case, as well as the D.C. Circuit's decision and GEV EPA, that the standard must be set out with ascertainable certainty, and FDA's own communications on May 8, 2020, four months before the deadline, FDA told another applicant, and I quote, currently FDA does not have specific requirements for evaluating comparator products in studies in a PMTA submission. If the agency itself didn't know from the statute four months before the deadline what its evidentiary standard was for comparator products, how could any applicant, regardless of their size or financial resources or level of sophistication? Where's that in the record? Your Honor, that's in the record, and I cited it from the 11th Circuit case from Biddy Vapor, and that case is part of the public record there, Your Honor, and it's cited in our opening brief. On the point of prejudicial error, I'd point the court to the 2006 decision of this court in Biz Capital v. Comptroller of the Currency for the proposition that a reviewing court is not generally empowered to conduct a de novo inquiry into the matter, being reviewed, and reach its own conclusions. There, the agency specifically represented to the court, if the court vacates and remands, we will deny again, and the court said, that's still prejudicial error, and it needs to be vacated and remanded, even if you stand here and promise to us that you're going to do the exact same thing again. Same thing here. One of the points I want to make, counsel talked about the youth usage rates in 2015 and 2016. It's a critical fact that at that point in time, the federal minimum age for purchase of ENDS products was only 18. High school seniors could legally purchase the products in the corner convenience store, and if they decided to sell some to their friends at school, they could. It's now 21, materially different time, materially different circumstances, and counsel talked about the NYTS data on refillable devices and talked about cartridge-based refillable devices, so a smaller, compact device, but it could potentially be refilled with e-liquid, but there again, the NYTS data belies FDA's argument and shows it's not rational, because from 2020 to 2021, in 2021, they expanded the definition of that category of products to include those refillable cartridge-based products, yet the percentage of youth users that used those went down from 48.5% to 28.7%, so again, we have the trend lines going in the wrong direction. It doesn't support what FDA is claiming. Now, FDA seems to claim that the marketing restrictions have to be unique. I've cited, too, and we've briefed several unique marketing restrictions here that were not in the 2020 enforcement guidance, which itself only pointed to them being ineffective as to cartridge-based products, and in fact, as Judge Jones pointed out in her dissent, and as Biddy points out as well, explicitly said that if it's a vape shop-type product, an open-system bottled e-liquid, in fact, they expected those restrictions to be effective, but if they have to be unique, that in and of itself is a new and previously undisclosed standard that doesn't account for and is being adopted now without notice, and that goes to a broader point, which I think Judge Oldham is touching on. Let's forget for a second this is a case about a tobacco product or about an ENDS product or nicotine. There are bright-line administrative law rules that were flagrantly violated by FDA in many different directions in this case, and this could be IRS about what the point is here. Let's forget it. Divorce it for a second from the product at issue. FDA has trampled upon the long-standing Supreme Court precedent setting out the black-letter rules of the road in this area, and the court must put a stop to it. Going back to the switcheroo for a second, really the timeline itself tells the story. Starting in the public meetings in 2018 and 2019, which again several of the other circuits don't even account for, much less address, and in the PMTA guidance and in its proposed PMT rule that ran 93 pages in the Federal Register, FDA said absolutely nothing about a requirement for a longitudinal comparative efficacy study. As I referenced a minute ago on May 8th, four months before the deadline, they told another applicant, we don't have a specific requirement, and in fact what they said in all those presentations and in their guidance is pick up the product you want to compare it to. Gee, we think it would be good for you to compare it to a combustible cigarette. They in fact specifically recommended that. That's what petitioners did here, and then the first time we hear of this or see it in the record is the fatal flaw memo that was not published to applicants 10 months after the deadline on July 9th, 2021. Then we have over a month after that the backfilling justification for setting that in the August 17th memo, and then FDA perhaps recognizing that this looks an unsubstantive rule that's being adopted without notice or comment or consideration of reliance interests, then a day before the press release goes out, puts in the record a three-page memo saying on August 25th, we're going to go ahead and rescind that because now it's going to be adjudication, but in fact as Judge Jones properly found in the R.J. Reynolds decision, this is a substantive rule. It's not a close case in her words in that decision. It clearly satisfies all three criteria, and it's underscored in the language of the August 17th memo that finds its way word for word into every single one of these TPL reports that we've listed in our brief in at least five different places explicitly says based on our experience reviewing these applications since they have come in, September 9th, 2020 was the court-ordered deadline for those to come in. Since those have come in and based on our review of those applications since that time, this is what we're now concluding. It's flavors that are driving youth initiation, um, we now need to set the standard. We can't, we can't rely on single point in time perception and intent studies, um, and by the way, these advertising promotion restrictions, we don't even need to look at them anymore because what we've looked at doesn't work. Um, so the timeline itself frankly tells the story here. Um, respectfully, we urge the court to vacate the MDO and remand it back to the agency with appropriate instructions. Thank you. All right. Thank you. Court stands in recess.